CLAIRE REMBA, Respondent, v FEDERATION EMPLOYMENT AND GUIDANCE SERVICE, Appellant.

First Department, August 17, 1989

### APPEARANCES OF COUNSEL

*David H. Diamond* of counsel *(Frederic C. Leffler* and *Donald S. Krueger* with him on the brief; *Summit Rovins & Feldesman,* attorneys), for appellant.

*Eugene Prosnitz* for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

Plaintiff was employed by Federation Employment and Guidance Service (FEGS), a not-for-profit agency, as a coordinator of employment services from February 23, 1987 until May 29, 1987 when, while still a probationer, her services were terminated for alleged unsatisfactory job performance. Eleven months later she commenced this action pursuant to Labor Law § 740 (2) (a) and (c) (Whistleblower Law), claiming

that she was discharged because of her objection to, and refusal to participate in, FEGS's alleged fraudulent billing of the City of New York for placements it never made. FEGS finds employment for job applicants or places them in educational or training programs, for which it receives funding from the city.

FEGS moved, pursuant to CPLR 3211 (a) (7), to dismiss the complaint on the ground that it failed to satisfy the two elements which are conditions precedent to the maintenance of an action under the Whistleblower Law, i.e., to allege a law, rule or regulation allegedly violated by FEGS, and to demonstrate that the alleged violation would create and present a substantial and specific danger to the public health or safety. In opposition, plaintiff asserted that FEGS's billing practices constituted a larceny (Penal Law § 155.05), and that section 740 (2) (c) of the Labor Law does not require a showing that the violation of law presents a substantial and specific danger to the public health and safety, or alternatively, that FEGS's conduct does indeed present a substantial danger to the public health and safety.

■ ■ The court denied the motion, finding that the complaint states a valid cause of action under the Labor Law, and suggesting that, after joinder of issue, FEGS, "if it deems it to be advisable, may move for summary judgment pursuant to CPLR 3212." We are satisfied that the complaint meets the requirement of alleging a violation of law as it sets forth facts which, if established, would constitute the crime of larceny. We nevertheless reverse and dismiss since plaintiff has failed to set forth facts satisfying the statute's other requirement, that the alleged violation of law, i.e., fraudulent billing, would create and present a substantial and specific danger to the public health or safety.

In pertinent part, section 740 of the Labor Law provides:

"2. * * * An employer shall not take any retaliatory personnel action against an employee because such employee does any of the following:

"(a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety * * *

"(c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation."

As is apparent from the plain words of the statute, not every disclosure, or threat of disclosure, by an employee of a practice in violation of a law, rule or regulation is protected by Labor Law § 740. The Legislature specifically provided that the statute's protection extends to only those violations which create and present a "substantial and specific danger to the public health or safety".

Although the phrase "substantial and specific danger to the public health or safety" is nowhere defined in Labor Law § 740, the comments contained in the Bill Jacket are revealing —"This bill would protect public and private sector employees who disclose violations of law, rule or regulation which present a substantial danger to public health or safety by prohibiting certain types of retaliatory action by their employers." Also noted is the statute's limited scope: "This bill protects public and private employees only in situations where disclosure of violations of law, rule or regulation would adversely affect public health and safety." The Attorney-General's memorandum also recognized the bill's limited applicability: "The bill is intended to protect employees who disclose to governmental authorities information about, or refuse to engage in, employer wrongdoing which is dangerous, unsafe or inimical to the public welfare."

Since, by its terms, the Whistleblower Law applies to relatively few situations, several proponents excepted to its narrow scope and urged broader application. (See, Bill Jacket, S 10074.) The Legislature, however, declined to do so. The Attorney-General's memorandum provides examples of conduct that, in his opinion, would not come within the protection of the law:

"This bill, however, does not clearly protect all 'whistle blower' employees. It is unclear whether the bill would, in all situations, provide a remedy for employees who refuse to engage in or who reveal illegal financial or accounting practices, such as filing false tax returns on the employer's behalf. If we are ever to make a dent in the wide-spread abuses known as 'white collar' crime, employees who disclose such illegal practices must be confident that they, too, will be protected. I urge that this defect in the bill be cured by future legislation.

"Nevertheless, this bill is a critical first step, and for the reasons stated, I urge its approval." (Ibid.)

Indeed, if, as the Attorney-General indicates, white-collar crime is not covered, fraudulent billing would obviously be

beyond the statute's purview. Thus, the Whistleblower Law should be viewed as a narrow and specific statutory exception to the employment-at-will doctrine. Any effort to expand its protections is properly for the Legislature, not the courts. *(See, Murphy v American Home Prods. Corp.,* 58 NY2d 293, 301.)[1]

Moreover, even if plaintiff reasonably believed that the alleged fraudulent billing practice could create a substantial and specific danger to the public health or safety, such belief would not place her under the protection of Labor Law § 740. The law requires that there be not only an actual, as opposed to a possible, violation, but also an actual and substantial present danger to the public health. Reasonable belief as a basis for protection under Labor Law § 740 will not suffice. Indeed, prior to and since enactment of the law, bills have been introduced in the New York State Senate to broaden the statutory standard to one of reasonable cause. The Legislature, however, has consistently and repeatedly resisted any such change. *(See,* 1983 NY S 1153; 1987 NY S 1995, A 6485; *see also, Kern v DePaul Mental Health Servs.,* 139 Misc 2d 970, 973.)[2]

Other whistleblower statutes have recognized the distinction between white-collar crimes and violations of law which present a substantial and specific danger to the public health and safety. *(See, e.g.,* Ann Code of Md, art 64A, § 12G; *see also,* 5 USC § 2302 [b] [8] [A] [ii] [reprisal prohibited for disclosure of "mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety"]; 5 USC § 2303 [a] [2] [same]; 10 USC § 1587 [b] [1] [B]; [2] [B] [same]; Ill Ann Stat, ch 127, § 63b119c.1 [1] [ii] [same].)

■ Noting that Labor Law § 740 has separate provisions dealing with disclosure of unlawful activities (subd [2] [a]) and refusal to participate in unlawful activities (subd [2] [c]),

---

1. The dissent, quoting language from *Sabetay v Sterling Drug* (69 NY2d 329, 337), grounds its argument, in large measure, on the premise that the Whistleblower Law was intended to prohibit employers from discharging at-will employees for reasons "contrary to public policy", and that perpetrating a fraud upon the government by committing larceny is contrary to public policy. Such an argument ignores the codification of the public policy, as set forth in Labor Law § 740 (2) (a), which requires a showing that the violation of law "creates and presents a substantial and specific danger to the public health or safety". Absent such a demonstration, the complaint cannot be saved.

2. It is interesting to note that in 1981 the Legislature rejected a bill which would have protected employees from retaliatory discharge for taking actions which benefit society in general. (1981 NY A 2566.)

plaintiff argues that the omission in subdivision (2) (c) of the specific words of subdivision (2) (a)—"which violation creates and presents a substantial and specific danger to the public health or safety"—reveals a legislative intent to protect from loss of employment all employees who refuse to perform any unlawful act. Thus, she claims, while the disclosure portion of the statute requires a substantial and specific danger to the public health or safety, the refusal to participate portion does not. We disagree.

Both subdivisions (2) (a) and (c) of section 740 require that the violation of law create and present a substantial and specific danger to the public health or safety. As is conceded, the plain statutory language compels this conclusion with respect to subdivision (2) (a). Insofar as subdivision (2) (c) is concerned, both the Legislature's manifest intent and ordinary principles of statutory construction mandate a similar conclusion. Labor Law § 740 (2) (a), (b) and (c) are not separate and distinct but, rather, part of a statutory scheme to protect employees who "blow the whistle" on employers engaging in unlawful activities which create and present a substantial and specific danger to the public health or safety. Subdivisions (2) (a), (b) and (c) are interwoven and dependent, as demonstrated by the use of the modifying term "such" in subdivisions (2) (b) and (c). Subdivision (2) (b) protects any employee who "provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer". Clearly, the term "such", which appears in both subdivisions (2) (b) and (c), limits the scope of the unlawful activity.

If, as plaintiff argues, the refusal to participate in any unlawful activity, without more, is protected against retaliatory personnel action, then the same argument can be made that any information or testimony provided by an employee to a public body investigating any violation of law is similarly protected. Not only would the term "such" be superfluous, but plaintiff's argument, taken to its logical conclusion, would mean that the employee who initiates the investigation of unlawful activity by a public body would not be protected unless the unlawful activity creates and presents a substantial and specific danger to the public health or safety, while the employee who testifies at a public hearing investigating the same unlawful activity would be protected regardless of whether the activity involved a substantial and specific danger to the public health or safety. Such an anomaly would grant

greater protection to the employee who cooperates with an investigation than the employee who initially "blew the whistle". Obviously, the Legislature never intended such a result. Labor Law § 740 was narrowly drafted to protect only those employees who, with respect to conduct engaged in by their employer, disclose, provide information about, or refuse to participate in, unlawful activity that presents a substantial and specific danger to the public health or safety.

In any event, the language in subdivision (2) (c), that is, "such activity, policy or practice", has as its antecedent the limited "activity, policy or practice" in paragraph (a), which results in a violation that creates and presents a substantial and specific danger to the public health or safety. This reading is unavoidable given the use of the limiting adjective "such" in paragraph (c). "[T]he word 'such,' when used in a statute, must, in order to be intelligible, refer to some antecedent, and will generally be construed to refer to the last antecedent in the context, unless some compelling reason appears why it should not be so construed." (McKinney's Cons Laws of NY, Book 1, Statutes § 254.)

In *United States v Bowen* (100 US 508), the court had to construe a statute which, insofar as is pertinent, provided: " '[T]he fact that one to whom a pension has been granted for wounds or disability received in the military service has not contributed to the funds of the Soldiers' Home, shall not preclude him from admission thereto. But all such pensioners shall surrender their pensions to the Soldiers' Home during the time they remain there and voluntarily receive its benefits' " *(supra,* at 511). The court noted, "If the qualifying word *such* is restricted to pensioners described in the sentence which immediately precedes it, then Bowen does not belong to that class [i.e., he had contributed to the funds of the Home], and is not bound to surrender his pension." *(Supra,* at 512.) In contrast, the Government had argued that "all such pensioners" were required to surrender their pensions while staying at the Soldiers' Home regardless of whether they had contributed to the Home *(supra,* at 509). In opting for the former construction, the court noted, "There is no antecedent use of the word 'pensioners' * * * to which the word *such* can refer, but the immediately preceding sentence in the same section" *(supra,* at 512), and added:

"If the [Government's] construction be correct, [the word *such]* is useless, for it would express the idea with precision by reading, 'But all pensioners shall surrender their pensions to

the Soldiers' Home during the time they remain therein and voluntarily receive its benefits.' * * *

"The word *[such]* however, as there used, has an appropriate reference to the class of pensioners who have not contributed to the funds of the institution, and no sound canon of construction will authorize us to disregard it, when to do so changes very materially the meaning of the section." *(Supra,* at 512-513.)

In this case, the phrase in subdivision (2) (c)—"any such activity, policy or practice"—clearly has as its antecedent the unlawful activity, policy or practice referred to in paragraph (a), which unlawful activity is unequivocally qualified by the requirement that it create and present a substantial and specific danger to the public health or safety. Plaintiff's limited reading of Labor Law § 740 (2) (c) so as not to require a showing that the violation of law, rule or regulation creates and presents a substantial and specific danger to the public health or safety is directly contrary to the plain language of the statute, inasmuch as it impermissibly renders the word "such" meaningless, and materially changes the statute's import.

■ Plaintiff's alternate argument that FEGS's alleged conduct in submitting false vouchers does, in fact, create a substantial and specific danger to the public health, is unavailing. She has not and apparently cannot set forth facts sufficient to establish a statutory claim. Her statement that improper billing practices constitute a substantial and specific danger to public health and safety, without any supporting facts, is legally deficient and will not support a cause of action. *(Kaufman v International Business Machs. Corp.,* 97 AD2d 925; *Roberts v Pollack,* 92 AD2d 440, 444.)

Accordingly, the order of the Supreme Court, New York County (Irma Vidal Santaella, J.), entered September 8, 1988, which denied defendant's motion to dismiss the complaint, should be reversed, on the law, without costs or disbursements, and the motion granted.

ELLERIN, J. (dissenting). While I am in agreement with the majority opinion to the extent that it holds that the violation referred to in each of the paragraphs of Labor Law § 740 (2) is a "violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety", I cannot agree with the conclusion, that the statute does not cover the larcenous conduct here involved,

based upon fraudulent billing of the City of New York for placements of unemployed persons in jobs or training that were, in fact, never made.

In *Sabetay v Sterling Drug* (69 NY2d 329) which reaffirmed the unfettered right of an employer to terminate an at-will employment relationship at any time, even where it is based on the employee's refusal to participate in improper, unethical or illegal activities, the Court of Appeals observed that significant alteration of this principle was best left to the Legislature. It noted (at 337), however, that "[i]ndeed, the Legislature has responded to this appropriate sensitivity by enacting numerous protections against abusive discharge and by prohibiting employers from discharging at-will employees for reasons contrary to public policy", including among its citation of those enactments the instant section of the Labor Law. It can hardly be gainsaid that perpetrating a fraud upon the government by committing larceny in connection with a critical program directed toward eliminating unemployment is "contrary to public policy".

While the majority refers to the Attorney-General's memorandum as providing examples of conduct that, in his opinion, would not come within the protection of the law, that memorandum, in fact, makes no such unequivocal statement. On the contrary, it manifests concern because "[i]t is *unclear* whether the bill would, *in all situations,* provide a remedy for employees who refuse to engage in or who reveal illegal financial or accounting practices". (Emphasis added.) Also significant is the Attorney-General's evaluation that the bill is intended to protect employees in connection with "employer wrongdoing which is dangerous, unsafe or inimical to the public welfare". That the conduct here involved is inimical to the public welfare is self-evident.

In light of the Attorney-General's reasonable commonsense, albeit cautious, characterization of the bill's intent, it is difficult to understand the majority's unnecessarily restrictive interpretation and its conclusion that the law should "be viewed as a narrow and specific statutory exception to the employment-at-will doctrine". The suggested recourse to the Legislature seems to overlook the fact that the statute involved was enacted in response to the decision in *Murphy v American Home Prods. Corp.* (58 NY2d 293) which upheld the corporate employer's right to terminate an at-will employee who revealed certain illegal account manipulations to officers and directors of the corporation and refused to engage in such

improprieties. The problem which gave rise to this legislation is not entirely without significance and the intent of the statute should be evaluated in that context. While the Budget Report on the bill indicates that the bill is not all-inclusive, it does not impart the rigid, restrictive view taken by the majority but rather indicates, in recommending enactment, that the "bill strikes a reasonable balance between employee and employer concerns and is in the best interests of the public".

Since the instant action is not predicated upon private accounting irregularities or wrongdoing involving only private parties but involves illegal and harmful acts directly against the city government, it also directly affects the interests of the public and may well be construed as adversely affecting the public health and safety within the statutory context. At the very least, plaintiff should be afforded an opportunity, through discovery and other procedures, to establish that the statutory protection is intended to cover such violation and dismissal of the complaint, at this stage, for failure to state a cause of action is unwarranted.

Accordingly, I would affirm.

ASCH and KASSAL, JJ., concur with SULLIVAN, J. P.; ELLERIN, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on September 8, 1988, unanimously reversed, on the law, without costs and without disbursements, and the motion granted.