Janine COLLETTE, Plaintiff,

v.

ST. LUKE'S ROOSEVELT HOSPITAL,
Defendant.

No. 00 CIV 4864 GEL.

United States District Court,
S.D. New York.

Feb. 26, 2001.

Robert J. Barsch, Brooklyn, NY, for Plaintiff Janine Collette.

David R. Marshall, Littler Mendelson PC, New York City (Erika L. Ozer, Littler Mendelson PC, New York City, of counsel) for Defendant St. Luke's Roosevelt Hospital.

### OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Janine Collette ("Collette" or "plaintiff") sued her former employer, claiming among other things that it discriminated and retaliated against her on account of her raising various objections to its employment practices. Defendant St. Luke's Roosevelt Hospital ("St. Luke's" or "defendant") moves to dismiss the Com-

plaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. St. Luke's argues that Collette's claims fail as a matter of law to justify relief, and that essentially all of them are barred because Collette waived them by asserting a claim for similar relief under New York's "whistleblower" statute, N.Y. Labor Law § 740, in an earlier lawsuit. For the reasons stated below, this Court rejects defendant's claim that New York law works a waiver of plaintiff's federal claims, but accepts the argument that certain of plaintiff's asserted causes of action do not state claims for which relief can be granted. Accordingly, defendant's motion is granted in part, and denied in part.

## BACKGROUND

### I. Facts

Except where noted, the following material facts are alleged in plaintiff's Complaint and accepted as true for purposes of defendant's motion. Collette was hired by St. Luke's in or about January 1997, first as an independent contractor working for defendant's Continuing Medical Education ("CME") program and later, on defendant's payroll, as the CME Coordinator. (Compl. ¶ 9, Ex. E. ¶ 13.) As CME Coordinator, Collette was asked to create a three-year business plan describing the structure, mission, and funding for a financially self-sufficient CME Department that could handle continuing education matters for St. Luke's, one of its sister hospitals, and its corporate parent, Continuum Health Partners ("Continuum"). (Id. ¶ 15.) Collette proposed a plan by which administrative functions were coordinated between the two hospitals by a full time staff led by a Director and Assistant Director of CME, and overseen by a manager at Continuum. (Id. ¶ 18, Ex. A. ¶ 8, Ex. D., Ex. E. ¶ 28.) St. Luke's adopted Collette's proposed plan in large measure. (Id. ¶ 16, Ex. E. ¶¶ 15, 27.)

Collette alleges that she acquired an understanding that she would be given one of the directorial positions once her plan was implemented, and that she had been told by defendant's representatives that she was "most qualified" for the new positions. (Id. ¶¶ 19, 27, 32.) However, St. Luke's selected other candidates—Lois Grossman for the position of Director and Ruth Weinstein for the position of Assistant Director. (Id. ¶¶ 27, 32.) Collette was told that she had not been seriously considered for a directorial position since she "was off to better things," and "wouldn't be interested in the position." (Id. ¶ 26.) During the initial implementation of the administrative plan, Collette made various complaints about the manner by which St. Luke's filled the managerial positions, and about the competence of Ruth Weinstein for the position of Director. In particular, Collette complained that St. Luke's violated equal employment opportunity requirements by failing to post a notice of the directorial job openings, and by considering only Jewish applicants for the directorial positions. (Id. ¶¶ 55–58.) Collette also charged that the CME program had violated accreditation standards by accepting donations from pharmaceutical companies. (Id. ¶ 33–34.) She reported these alleged violations to the American Council for Continuing Medical Education ("ACCME"), the national accrediting body for medical education programs. (Id.) In September 1999, Collette submitted a Petition of Grievance ("Petition") to St. Luke's Employee Resources Department, detailing all of the above complaints. (Id. Ex. E.) Subsequent to filing the Petition, Collette was isolated by her immediate supervisors and treated in a generally unfavorable manner. (Id. ¶ 31.) On November 11, 1999, she was terminated. Collette now alleges the sole basis for her termination was "[her] opposition to defendant's unlawful employment practices." (Id. ¶ 35.) At the time of her termination, St. Luke's claimed that she was no longer needed since the new administrative plan did not provide for the continuation of Collette's CME Coordinator position. (Id. Ex. G.)

## II. *Prior Proceedings*

In December 1999, Collette commenced an action against St. Luke's in this Court (her "prior action"), alleging that St. Luke's had (1) violated New York's Whistleblower Protection Act, N.Y. Labor Law § 740 ("Whistleblower Act" or "Act"), by firing her in retaliation for her reporting to the ACCME "over one hundred thousand dollars" of illegal pharmaceutical contributions allegedly received by the directors of CME, and (2) violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), on account of unpaid overtime wages. (Marshall Aff. Ex. 2.)

The retaliation claim was based solely on plaintiff's "disclos[ure of] unlawful actions to the American Council for Continuing Education." (*Id.* Ex 2 ¶¶ 13–19.) The legal basis of the claim was New York's Whistleblower Act, which provides in pertinent part:

2. Prohibitions. An employer shall not take any retaliatory personnel action against an employee because such employee does any of the following:

(a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule, or regulation which violation creates and presents a substantial and specific danger to the public health or safety

N.Y. Labor Law § 740(2)(a). Collette claimed that the alleged unlawful payments "presented a substantial and specific danger to public health and safety" (Marshall Aff. Ex. 2 ¶ 16), that St. Luke's had fired her because she had reported those violations to her supervisors (*id.* ¶ 14), and that her termination therefore violated the Act (*id.* ¶ 17). On June 26, 2000, the parties entered a joint stipulation of settlement dismissing Collette's FLSA and Whistleblower Act claims. (Marshall Aff. Ex. 3.) The joint stipulation expressly reserved plaintiff's right to bring future "employment discrimination claims, as set forth in Collette's EEOC Charge . . . and any claim for earned, unused, and unpaid vacation, holiday or personal pay for which Collette was eligible." (Barsch Aff. Ex. A.) [1]

Four days later, on June 30, 2000, plaintiff filed her complaint in this action, alleging seven causes of action. The Complaint does not allege retaliation on account of Collette's report to the ACCME, or violation of the FLSA, which were the bases of her prior action. Plaintiff's first cause of action alleges wrongful retaliation in violation of Title VII, claiming that Collette was fired because she had reported to her immediate supervisors, and to the defendant's Employee Resources Department, that St. Luke's had engaged in discriminatory hiring practices and had violated federal regulations requiring the posting of all available employment positions. (Compl.¶¶ 9–39.) Plaintiff's second and third causes of action allege similar retaliatory discharge claims under comparable New York State and New York City laws prohibiting employment discrimination, respectively, New York State Executive Law ("Exec.L.") § 296(7) (*id.* ¶¶ 40–46), and the New York City Administrative Code ("NYCAC") (*id.* ¶¶ 47–53). Like the first cause of action, these counts allege retaliation on account of Collette's reporting of defendant's disparate hiring practices and violation of federal posting requirements.

Plaintiff's fourth cause of action alleges that Defendant's purposeful failure to post the available directorial position had a dis-

---

1. Because the settlement agreement that ended Collette's prior action explicitly provided that the agreement was without prejudice to her bringing a separate action for employment discrimination, defendant expressly disavows any argument that the present action is precluded by doctrines of res judicata or collateral estoppel. (Tr. 5.) Defendant's argument is the quite different claim that under the waiver provisions of the Whistleblower Act, the institution of a whistleblower action in itself operated to waive plaintiff's discrimination claims; even if both sets of claims had been included in the same action, the waiver argument would be the same.

parate impact on candidates who were "non-Jewish," in violation of Title VII. (*Id.* ¶¶ 54–59.) Her fifth and sixth causes of action set forth parallel claims of disparate impact discrimination in violation of Exec. L. § 296 (*id.* ¶¶ 60–65), and the NYCAC (*id.* ¶¶ 66–71).[2]

Plaintiff's seventh cause of action (mislabeled in the Complaint as a second "sixth" claim) alleges that St. Luke's is in breach of her employment contract in that Collette is owed back pay and unused vacation time. (*Id.* ¶¶ 72–75.) The parties agree that this count is a pendent claim based on state common law, over which this Court has jurisdiction if but only if any of plaintiff's federal claims survive defendant's motion to dismiss. (Tr. 41.)

In the instant Complaint, defendant moves to dismiss all seven causes of action, chiefly on the ground that by filing a complaint pursuant to New York's Whistleblower Act, Collette waived her right to bring any other claim that may have arisen in the course her employment at St. Luke's. In the alternative, defendant moves to dismiss all but the seventh cause of action for failure to state a claim upon which relief can be granted. Oral argument was held on December 21, 2000.

## DISCUSSION

In the context of a motion to dismiss the Court accepts "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998) (internal citations omitted).

### I. New York Labor Law § 740(7)

Defendant's principal argument is that plaintiff's employment discrimination claims are waived because plaintiff brought a prior action against defendant seeking reinstatement under New York's Whistleblower Act, which provides, according to defendant, that bringing such an action operates as a waiver of any other causes of action that arise from the same course of conduct challenged under the Act. In actual fact, however, the "course of conduct" test of waiver suggested by defendant is not to be found in the Act. For the following reasons, the Court concludes that the waiver intended by the Legislature is considerably narrower than defendant proposes, affecting only other rights and remedies relating to the kind of wrongful retaliation prohibited by the Act itself. Accordingly, plaintiff's employment discrimination claims have not been waived.

### A. The Parties' Contentions

As stated above, plaintiff brought a prior action against defendant for retaliation in violation of New York's Whistleblower Act. That claim was settled, and she now brings the instant action alleging other theories of discrimination and retaliation under Title VII and comparable New York State and New York City anti-discrimination laws. St. Luke's argues that by instituting the prior action under the Whistleblower Act, Collette waived all subsequent claims arising out of "the course of conduct leading to her discharge." (Def.Mem.4–5.) It cites the Whistleblower Act's election of remedies provision, N.Y. Labor Law § 740(7) ("Subsection 7"), which provides in full as follows:

(7) *Existing Rights.* Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any employee under any other law or regulation

---

**2.** Specifically, claims five and six incorporate the allegations of claims one through four and allege in general terms that "defendant wrongfully discriminated against plaintiff by denying her promotion." (Compl. ¶¶ 64 & 70.) Since the only allegations of discrimination contained anywhere in the Complaint are of disparate impact discrimination, the Court treats claims five and six as parallel to the plaintiff's Title VII disparate impact claim.

or under any collective bargaining agreement or any employment contract; except that the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule, regulation or under the common law.

*Id.* The Act defines "[l]aw, rule or regulation" as "any duly enacted statute ... promulgated pursuant to any federal, state, or local statute or ordinance." *Id.* § 740(1)(c).

The defendant reads Subsection 7 to preclude any suit, brought under federal, state, or local law, so long as the suit "arises out of the same events and course of conduct" that led to the retaliation alleged in a whistleblower suit. (Def.Mem.7–8.) Therefore, it argues that six of Collette's claims in the instant action are barred (and that the Court therefore lacks jurisdiction over the seventh, pendent, claim), since "the purported discriminatory acts of which Plaintiff complains ... arose out of the same meetings, grievance petitions, conversations, and personnel decisions that formed the basis for her whistleblower claim." (Def. Reply Mem. 7.) St. Luke's argues that several state and federal district courts have adopted various "course of conduct" constructions of Subsection 7. *See, e.g., Gaughan v. Nelson,* No. 94 Civ. 3859(JFK), 1995 WL 575316, at

*6 (S.D.N.Y. September 29, 1995) ("arising out of the course of conduct supporting plaintiff's § 740 claim"); *Fischer v. Homes for Homeless, Inc.,* No. 93 Civ. 4270(PKL), 1994 WL 319166, at *2 (S.D.N.Y. June 28, 1994) ("any other claim arising out of the retaliatory personnel action"); *McGrane v. Reader's Digest Assoc. Inc.,* 863 F.Supp. 183, 185 (S.D.N.Y.1994) ("other claims arising out of the same events"); *Rotwein v. Sunharbor Manor Residential Health Care Facility,* 181 Misc.2d 847, 695 N.Y.S.2d 477, 483 (N.Y.Sup.Ct.1999) ("any other claims or remedies relating to the discharge").

■ Without Second Circuit or New York Court of Appeals authority on point, however, the defendant admits that none of the cited authorities bind this Court's interpretation of Subsection 7. (Tr. 8–10.) *See, e.g., Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) ("in diversity cases ... while the decrees of lower state courts should be attributed some weight ... the decision [is] not controlling ... where the highest court of the State has not spoken on the point") (internal quotation marks omitted) (alterations in original); *Calvin Klein Ltd. v. Trylon Trucking Corp.,* 892 F.2d 191, 195 (2d Cir.1989) ("Absent a rule of decision formulated by the New York Court of Appeals, we are not bound by the opinions issued by the state's lowest courts") (internal citations omitted).[3] Ac-

---

3. On close examination, moreover, the actual holdings of most of the cases cited by St. Luke's are distinguishable, and the intended reach of the dicta from those cases is unclear. In *Fischer, McGrane,* and *Rotwein,* the only claims actually held barred by the waiver provision of Subsection 7 were contract claims, where it was apparently argued that the employer's act of retaliation breached both the Whistleblower Act and plaintiff's employment contract. The holdings of those cases thus would seem not to require a broad waiver of any claim arising from the same "course of conduct" as the retaliatory personnel action, but simply the waiver of alternative legal bases for the same claim. *Gaughan,* which uses the broadest "course of conduct" language, is factually closest to this case, in that it prohibited plaintiff from pursuing state

law gender discrimination claims because he simultaneously argued that the same adverse employment actions violated the Whistleblower Act. However, in *Gaughan,* plaintiff argued that he was fired for protesting conduct that violated state anti-discrimination law, and that *those very discriminatory policies* themselves created a public health and safety threat. Thus, in *Gaughan,* plaintiff arguably tried to use the Whistleblower Act and the state anti-discrimination law as alternative remedies for the very same conduct motivated by the very same complaints. In this case, in contrast, plaintiff has contended that her termination was motivated by retaliation for two distinct types of complaint—one related to health policy and one related to equal employment opportunity. Further, in none of

cordingly, to interpret the scope of the provisions's automatic waiver in this case, the Court looks to its text, read in relation to the statute as a whole, and in light of the New York Court of Appeals' interpretation of its sister provisions. *See, e.g., Sprint PCS L.P. v. Conn. Siting Council,* 222 F.3d 113, 115–16 (2d Cir.2000) (when confronted with an unsettled interpretation of a state statute federal courts must "predict how the forum state's highest court would decide the issues before [them]") (citations and internal quotation marks omitted).

### B. *Analysis of § 740(7)*

#### 1. *Plain Meaning*

As it must with any issue of statutory interpretation, the Court begins with the text of the statute. *See, e.g., United States v. Piervinanzi,* 23 F.3d 670, 677 (2d Cir.1994) ("[T]he starting point for interpreting a statute is the language of the statute itself") (internal quotation marks omitted). Subsection 7 of the Whistleblower Act contains two clauses: The first ("Clause One") confirms that nothing in the Act should be read to "diminish the rights, privileges, or remedies" held by employees "under any other law." Therefore, that the New York Legislature chose to create a whistleblower protection regime, does not mean that it intended the regime as a *per se* substitution for rights and remedies granted under any other contract, federal or state statute, local ordinance, or regulation. That understanding comports with the Subsection's title— "Existing Rights." [4] The second clause ("Clause Two"), however, appears to mandate—immediately upon "institution" of suit—automatic waiver of all "rights and

remedies available" from "any" other source.

Citing Clause Two, St. Luke's argues that at the moment that Collette brought the prior action invoking the Whistleblower Act, she waived any right to challenge her discharge under Title VII or any other anti-discrimination statute. Notably, however, St. Luke's does not purport to base its argument on a literal reading of the statute. St. Luke's would limit the waiver to any cause of action that "arises out of the same events and course of conduct" as the whistleblower claim. (Def.Mem.7–8.) Read literally, however, Clause Two is much broader, for on a literal reading, that clause provides that institution of a whistleblower suit waives *all* rights and remedies, without limitation, that the plaintiff might have "under *any* other contract, collective bargaining agreement, law, rule, regulation or under the common law." (emphasis added). Taken literally, then, Clause Two would seem to provide that when an employee brings a whistleblower suit, *all* concurrent or future lawsuits brought by that employee, in any capacity whatsoever, are waived.

St. Luke's does well not to argue that this is what the statute means, for any such reading would raise a host of difficulties. First, such a reading would create an internal discrepancy between Clause One and Clause Two. For if it is true that invocation of a suit waives all rights of action, from any other source, then it can hardly be said (though Clause One does so) that "nothing" in the Act "diminish[es]" other rights of action. On a plain reading of Clause Two, New York's whistleblower regime not only "diminish[es]" other rights, but for employees who seek its

the cited cases was the right or remedy deemed waived a *federally-guaranteed* right. The cases thus did not deal with the special constitutional considerations that are relevant here. *See infra* pp. 266–67.

**4.** *See, e.g., Katzman v. Victoria's Secret Catalogue,* 923 F.Supp. 580, 584 (S.D.N.Y.1996) ("the title of a statutory provision can easily

resolve 'any possible ambiguity' in interpreting the meaning of that provision") (quoting *Mead Corp. v. Tilley,* 490 U.S. 714, 723, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989)); *see also F.T.C. v. Mandel Bros., Inc.,* 359 U.S. 385, 388–89, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959) (title of statutory provisions are "a useful aid in resolving an ambiguity").

shelter, it eviscerates them. No matter that a whistleblower-plaintiff may have other legitimate claims against his employer, or any other defendant, Clause Two renders such claims forever barred. This Court will not lightly read such a draconian provision into the Act, however, since to do so would not only render Clause One irrelevant, but would also in all likelihood chill rather than promote whistleblowing, and thereby undercut the very purpose of the statutory regime. *See, e.g. Rodgers v. Lenox Hill Hosp.*, 211 A.D.2d 248, 626 N.Y.S.2d 137, 139–40 (1st Dep't 1995) ("The statute's goal is to encourage employees ... to report hazards to supervisors and, if necessary, to public authorities, with the intended effect of offsetting the 'frequent tendency of layers within organizations to screen out information which might cause embarrassment if it reached the top of the organization or the outside' ") (quoting Givens, *Practice Commentaries*, McKinney's Cons.Laws of N.Y., Book 30, N.Y. Labor Law § 740, at 546 (McKinney 1988) ("*Practice Commentaries*")); *Practice Commentaries* at 546 (purpose of the Act is "to encourage those at the working level to report hazards to supervisors"); Executive Approval Memo-

randum, S. 10074 (N.Y.1984) ("This legislation establishes a major right for employees—the right to speak out against danger and harmful employer practices").[5]

■ Second, even apart from the resulting internal contradiction, a literal reading of Clause Two as triggering automatic waiver of any and all rights available from other sources would create an external ambiguity and lead to absurd results.[6] *See, e.g., Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available") (internal citations omitted); *Nussle v. Willette*, 224 F.3d 95, 101 (2d Cir.2000) ("the language of the statutory provision, if clear and unambiguous on its face, is presumed to bear its plain meaning unless the text suggests an absurd result") (citing *Devine v. United States*, 202 F.3d 547, 551 (2d Cir.2000)). Nothing in the text of Subsection 7 confines the sweep of its automatic waiver. Taken at face value, Clause Two does not restrict its reach to claims arising from the course of conduct being complained of in

5. Federal courts have generally been reluctant to read ambiguous provisions of other whistleblower statutes in ways that undermine their apparent purpose. *See, e.g., Haley v. Retsinas*, 138 F.3d 1245, 1250 (8th Cir. 1998) ("Laws protecting whistleblowing are meant to encourage employees to report illegal practices without fear of reprisal by their employers.... Accordingly, when the meaning of the statute is unclear from the text, courts tend to construe it broadly, in favor of protecting the whistleblower") (construing the whistleblower provision of the FDIA) (internal citations omitted); *Blackburn v. Reich*, 79 F.3d 1375, 1378 (4th Cir.1996) ("The overall purpose of the statute—the protection of whistleblowers—militates against an interpretation that would make anti-retaliation actions more difficult") (construing 42 U.S.C. § 5851(b)(2)(B) (Energy Reorganization Act)).

6. A text may be ambiguous in one of two ways: either it is internally inconsistent (an internal ambiguity), or it may appear clear on its face but becomes unclear when read in

light of an externality, or applied in a particular context (external ambiguity). Failure to consider both when reading a statutory text would "artificially truncate the interpretive process." Richard A. Posner, *The Problems of Jurisprudence* 263–64 (1990) (maintaining that resolving both "internal" and "external" ambiguities is central to the interpretive process). *See generally* J.G. Sutherland, *Statutes and Statutory Construction* § 58.02 (Norman J. Singer ed., 5th ed.1992) (resolving both "real" and "apparent" ambiguities in the statutory text is the central problem of interpretation). The Supreme Court recently confirmed this interpretive principle. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole"); *see also Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110, 119 (2d Cir.2000) (same) (quoting *Robinson* ).

the whistleblower claim, or to claims arising from the complainant's discharge, or even to claims brought against the employer. Instead, it says that simply bringing an action under the Whistleblower Act "shall be deemed a waiver of the rights and remedies available" from *"any"* other source. § 740(7) (emphasis added). The Act's definitional provisions confirm that rights and remedies waived include those otherwise available "pursuant to *any* federal, state or local statute or ordinance." § 740(1)(c) (emphases added). The text does not tell us where such waivers end; to the contrary, taken literally, it tells us that there is *no* end to them, since "any" (a term with which the Act's relevant provisions are replete) means "all" *ad infinitum. See, e.g., Webster's Third New International Dictionary* 97 (defining "any" as "one or more indiscriminately; One, no matter what one: *to indicate one that is selected without restriction or limitation of choice"*).

Consequently, a strict textual reading of Subsection 7, Clause Two, requires any plaintiff with the temerity to sue under the Act, to waive any other lawsuit, brought against any other defendant, on any other cause of action, for any other remedy, whatsoever. That cannot possibly have been the intention of the Legislature, and no court (quite appropriately) has interpreted the statute that way. For just this reason, the parties here essentially concede that a plain literal reading of Clause Two is impossible. Some construction is necessary, to delimit the rights and remedies that *are* waived under the statute. Neither party asks that the statute be interpreted according to its literal, unlimited reach; rather the parties differ over what limiting construction should be adopted.

### 2. *Alternative Constructions*

If some limitation on the rights and remedies waived by a whistleblower plaintiff must be read into the statute, however, the question remains: what limitation? In

effect, the Court must ask what words are implicit in Subsection 7 of the Act: "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies [*against whom? for what causes of action? under what circumstances?* ] under any other contract, collective bargaining agreement, law, rule, or regulation or under the common law." Three possible alternative constructions of subsection 7 are (1) that its waiver provision bars all claims brought against the plaintiff's employer; (2) that its waiver provision bars all claims arising out of the plaintiff's employment relationship with the defendant; or (3) that its waiver provision bars all claims arising out of the same course of conduct which led to the plaintiff's whistleblower claim. Any of these constructions would doom the plaintiff's instant Complaint. For the reasons that follow, however, the Court finds none of them satisfactory.

### a. *Claims brought against employer*

At a minimum, it seems clear that the waiver must apply only to claims made against the employer. The Legislature could have no rationale for holding that suing a former employer for claims of retaliatory discharge would waive a plaintiff's personal injury claims against another driver arising from an automobile accident. But a limitation based solely on the identity of the defendant would not go far enough. Waiving the plaintiff's personal injury claim would make no more sense if the other driver coincidentally happened to be the employer being sued by the plaintiff for violating the Whistleblower Act. So limiting the waiver simply to claims brought against the employer will not do.

### b. *Employment Relationship*

It also would not be enough, however, to limit the waiver to rights and remedies arising from the parties' employment relationship. In *Kraus v. Brandstetter,* 185 A.D.2d 302, 586 N.Y.S.2d 269, 270 (2d

Dep't 1992), an employee sued her employer both for defamation and for termination in violation of the Whistleblower Act. Noting that the alleged defamation had occurred four months earlier than the allegedly wrongful termination, the Appellate Division refused to find that the bringing of the whistleblower claim waived the defamation claim under Subsection 7, since the latter claim, though apparently job-related, was not related to the wrongful termination itself. This construction makes sense. In the present case, for example, Collette's seventh cause of action for breach of contract raises a similar problem to that in *Kraus*. Yet defendant does not argue that this claim was waived by bringing the whistleblower claim (Tr. 6), and rightly so. If St. Luke's owes Collette money, under her contract of employment, for vacation time accrued prior to her termination, there is no logical connection between that debt and the dispute about the reasons for her firing, and no reason to assume that the Legislature intended that a plaintiff with a valid claim of retaliatory discharge would be required either to forego a challenge to her firing or to seek reinstatement under the Act but forego earned and unpaid wages.

### c. *Course of Conduct*

■ St. Luke's advances a narrower, and more plausible, limitation of the waiver provision. It asks the Court to limit the waiver to rights and remedies "arising from the same course of conduct" as the alleged retaliatory termination. That formulation has some precedential support, having been adopted by some courts, including courts in this district. *See supra* pp. 8–9. But as noted above, the "course of conduct" test is a purely judicial creation, developed by courts to resolve the ambiguities of the statutory text. While it might have had intuitive appeal in the factual contexts facing the courts that adopted it, the formula lacks the authority either of the statutory text or of binding appellate precedent in either state or federal courts.

Several considerations counsel caution in applying the test here. First, it is by no means clear that the "course of conduct" standard avoids the dubious results of the limitations rejected above. Suppose, for example, an employer, hearing that an employee has reported a dangerous situation to the proper authorities, becomes enraged, fires the employee, and then punches her in the nose. There can be little doubt that the battery and the firing were parts of the same "course of conduct": they were committed by the same person, against the same victim, for the same reason, and at virtually the same moment. But the employer's wrongful actions invaded different interests of the employee, which are protected by different bodies of law, for different reasons. There is no apparent reason why the Legislature would have required the injured employee to choose between vindicating her physical security or her job security.

Moreover, the "course of conduct" construction raises particular concerns in context of the instant complaint. It is clear that Collette's whistleblower complaint and her employment discrimination claims arise from the same course of conduct, and indeed, more narrowly still, from the very same actions—defendant's failure to offer her a management position with CME, and its termination of her employment. Thus, under the "course of conduct" test, by bringing her prior action under the Act, Collette would be held to have waived her federal claims of disparate impact discrimination and retaliation for filing complaints of discriminatory employment practices. But an effort by New York to condition a *state* law right on the waiver of arguably unrelated *federal* rights would raise serious constitutional questions. *See, e.g.,* U.S. Const. Art. VI, cl. 2; *Testa v. Katt,* 330 U.S. 386, 390, 67 S.Ct. 810, 91 L.Ed. 967 (1947) ("the obligation of states to enforce ... federal laws is not lessened by reason of the form in which they are cast or the remedy which they provide"); *Har-*

*rison v. St. Louis & S F R Co,* 232 U.S. 318, 328, 34 S.Ct. 333, 58 L.Ed. 621 (1914) ("the judicial power of the United States ... is a power wholly independent of state action and which therefore the several States may not by any exertion of authority in any form, directly or indirectly, destroy, abridge, limit or render inefficacious"). Of course, whenever possible, an ambiguous statute should be construed to avoid constitutional questions.[7]

None of the cases adopting the "course of conduct" test stand for the proposition that a federal claim can be barred by resort to asserting a whistleblower claim under state law. To the contrary, federal courts have utilized this "policy of avoidance," *Lauro v. Charles,* 219 F.3d 202, 206 (2d Cir.2000), to construe the very provision at issue in this case, in order to avoid finding a waiver of federal rights. *See U.S. ex rel. Mikes v. Straus,* 853 F.Supp. 115, 121 (1994) (construing N.Y. Labor Law § 740(7) not to bar parallel and related *qui tam* action since "[s]tate action is not permitted to cause 'interference with policies implicated by the structure' of federal statutes") (quoting *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 749, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)); *Majer v. Metropolitan Transportation Authority, Metro–North Commuter R.R.,* No. 90 Civ. 4608(LLS), 1992 WL 110995, at *1 (S.D.N.Y. May 7, 1992) ("The New York state legislature will not be held to have required a waiver of constitutional rights unless that requirement is clear from the face of [the Whistleblower Act], which it is not").

Defendant's attempt to dismiss these constitutional concerns is overly sanguine.

The only case cited by St. Luke's as suggesting that § 740(7) does not implicate the Supremacy Clause is *Leaman v. Ohio Dep't of Mental Retardation & Development Disabilities,* 825 F.2d 946 (6th Cir. 1987) (*en banc*). There, the Sixth Circuit found no constitutional bar to a statutory scheme whereby Ohio waived its sovereign immunity and provided a direct state court action for damages against the state, but only for plaintiffs who waive any constitutional claims against individual state officers and employees. But *Leaman* only reinforces the constitutional doubts expressed above.

First, the Ohio statute at issue in *Leaman* is less constitutionally troubling than the scheme defendant would attribute to New York, and the case is therefore distinguishable. Ohio was providing an alternative state law remedy, otherwise unavailable, for the very wrong addressed by the federal remedy to be waived. Under the Ohio regime, for example, a plaintiff unconstitutionally arrested by a state police officer could sue the officer in federal court or the state itself in state court, but not both. Whichever forum and remedy the plaintiff elected, plaintiff would be vindicating the same right, judged by the same legal standard. But the "course of conduct" test advanced by the defendant in this case would require a plaintiff to give up federal rights independent of the right provided by state law: Collette, for example, in order to vindicate a state law right not to be retaliated against for reporting a public health threat, would have to waive federal rights not to be discriminated against on the basis of race, sex or religion. Offering an alternative but exclusive

---

7. *See, e.g., Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 683, 148 L.Ed.2d 576 (2001) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the legislature]") (internal quotation marks omitted); *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction ... the Court will decide only the latter"); *FEC v. Political Contributions Data, Inc.,* 943 F.2d 190, 191 (2d Cir. 1991) ("we are obliged to construe statutes to avoid constitutional problems whenever possible").

forum for vindicating a federal right, as in *Leaman,* is an entirely different matter from requiring plaintiffs in state law actions to sign away unrelated federal rights.

Second, even this less troubling issue deeply divided the Sixth Circuit, demonstrating just how difficult the constitutional issues are. The *en banc* court in *Leaman* divided eight to six, producing six separate opinions. As one of the dissenters noted, "[t]his court is obviously and painfully split" over the merits of the constitutional issue. *Leaman,* 825 F.2d at 969 (Martin, J., dissenting). Consequently, the policy of constitutional avoidance weighs heavily in favor of seeking sensible alternatives to any construction of the Act which would require automatic waiver of the plaintiff's federal rights. *See, e.g., United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916) (Holmes, J.) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score").

### 3. *Sources of Interpretation Under State Law*

■ While these considerations raise significant doubts about the "course of conduct" construction of Subsection 7, they do not provide much guidance in developing an alternative interpretation. This Court should be particularly careful, moreover, in construing state statutes. In addition to the normal judicial deference to the democratically-elected legislative branch, the Court must also consider that the Act in question expresses the will of a separate sovereignty. When considering alternative constructions of state laws, federal courts are "without power to adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent." *Boos v. Barry,* 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Here, fortunately, a narrow construction is available that is both reasonable and readily apparent from the statute construed as a whole, as well as from guides to interpretation provided by the state itself.

Arguing against defendant's "course of conduct" interpretation, plaintiff points out that the rights she seeks to vindicate in this action are entirely distinct from those protected by the Act. (Pl.Mem.7–8.) The Act seeks to promote the public interest in disclosure of violations of law that present "a substantial and specific danger to the public health and safety" by prohibiting employers from retaliating against employees who reveal such violations. N.Y. Labor Law § 740(2)(a). Title VII, on the other hand, and its state and city analogues, seek to protect employees against discrimination on the basis of irrelevant personal characteristics such as race or gender. Plaintiff argues, in effect, that the waiver provision contained within the Act should be read to require employees who invoke its protection to waive only other legal rights and remedies that protect against the same wrong that the statute itself prohibits.

The Court agrees with this construction, for not only is it reasonable, but also, unlike the alternative constructions discussed above, it has the virtue of growing out of the statute itself, rather than being made up out of whole cloth by judicial fiat. Indeed, unlike the "course of conduct" test, the limiting construction suggested by plaintiff is consistent with the language of the statute, its legislative history, and the "practice commentaries" provided by the State of New York.

### a. *Statutory Scheme*

First, a construction of Subsection 7 that limits the reach of its waiver clause only to rights and remedies that protect whistleblowing as defined in the Act, is consistent with the statutory scheme as a whole. *See, e.g., United States v. Pacheco,* 225 F.3d 148, 154 (2d Cir.2000) ("The 'whole act' rule of statutory construction exhorts us to read a section of a statute not in isolation from the context of the whole Act but to look to the provisions of the whole

law, and to its object and policy") (internal quotation marks omitted). New York's Whistleblower Act provides New York employees with a limited protection for a carefully-defined category of whistleblowing activity: reporting violations of any law, rule or regulation which "creates and presents a substantial and specific danger to the public health or safety." N.Y. Labor Law § 740(2)(a). Such protection is not available to New Yorkers at common law. *See, e.g., Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 297, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (declining to recognize whistleblower or other public policy protection for at-will employees since "such recognition must await action of the Legislature"); Sen. Budget Rep., S–10074, (N.Y.1984) (urging passage of whistleblower protection since "[p]resently, public and private sector employees have no legal protection from retaliatory actions by their employees if they disclose or attempt to disclose violations of the law, rule or regulation which adversely affect public health and safety"). But the Act does not extend its protections to those who complain of *any* unlawful conduct by the employer. If the employer is breaching contracts, defrauding consumers, or violating equal opportunity laws, an employee who blows the whistle does so (insofar as the Act is concerned) at his or her own risk; the Act provides no protection. *See, e.g.,* Attorney General's Memorandum (noting that the Act does not "provide a remedy for employees who refuse to engage in or who reveal illegal financial or accounting practices, such as filing false tax returns on the employer's behalf"), *quoted in Remba v. Federation Employment and Guidance Serv.,* 149 A.D.2d 131, 545 N.Y.S.2d 140, 142 (1st Dep't 1989), *aff'd,* 76 N.Y.2d 801, 559 N.Y.S.2d 961, 559 N.E.2d 655 (1990).

Relief available under the Act, moreover, is limited to specifically-defined statutory remedies. A plaintiff who sues under the Act may only seek an injunction against further retaliation, reinstatement of employment with full benefits, compensation for lost wages, and attorneys' fees. *See* N.Y. Labor Law § 740(5). The Legislature thus deliberately shielded employers from secondary claims for damages such as emotional distress, loss of reputation or loss of consortium—or any other claim that might arise from whistleblower-retaliation—which might upset the delicate balance of employee protection and employer freedom of action crafted by the Act. For example, whistleblower-plaintiffs have been prohibited from seeking punitive damages, *see Granser v. Box Tree South, Ltd.,* 164 Misc.2d 191, 623 N.Y.S.2d 977, 984 (N.Y.Sup.Ct.1994), or demanding a jury trial, *see Scaduto v. Restaurant Associates, Industries, Inc.,* 180 A.D.2d 458, 579 N.Y.S.2d 381, 381–82 (1st Dep't 1992), or seeking damages for loss of consortium, *see Goldman v. M.C.L. Companies of Chicago, Inc.,* 131 F.Supp.2d 425, 2000 WL 1877066, *2 (S.D.N.Y.2000), where the nature of their claim arose from alleged retaliation for activities protected exclusively by statute under the Whistleblower Act.

The narrow scope of the statutory right and remedy supports an equally narrow view of the waiver of rights that is attached to the Act. The New York Legislature established a cause of action not otherwise available at common law, thereby subjecting employers to a new mode of litigation, but as part of the bargain, shielded employers from the threat of having to defend overlapping claims, or to pay duplicate damages, for suits brought to redress violations of the new statutory right. Moreover, the new, narrow right was unnecessary as a protection for employees who were already protected, by contract, collective bargaining agreement, or some other source of law. *See, e.g.,* 31 U.S.C. § 3730(h) (whistleblower provision of the False Claims Act).[8] The Legisla-

---

8. Several other federal whistleblower provisions may, in certain instances, overlap with New York's regime. *See, e.g.,* 15 U.S.C. § 2622 (Toxic Substances Control Act); 29 U.S.C. § 158(a)(4) (National Labor Relations Act); 30 U.S.C. § 815(c)(1) (Federal Mine

ture has carefully constructed a narrow new right, designed to protect conduct that was previously unprotected, but not to permit a cumulation of remedies or causes of action that would impose greater burdens on employers than the Legislature specifically intended. Accordingly, a plaintiff who seeks protection against retaliation for reporting the kind of specific violations with which the Act is concerned must elect either to invoke the Act as the exclusive means to vindicate this protection, or to pursue some other remedy.

The same reasoning, however, does not apply (or at least the "whole act rule" does not indicate why it should) where the plaintiff states a separate cause of action to redress a harm to a legal interest entirely distinct from the protection of employees who report threats to the public health and safety. Such a cause of action, arising from a separate and independent interest, unrelated to retaliation for the kind of whistleblowing with which the Act is concerned, does not overlap with the cause of action brought under the Act, or in any way add to or detract from the remedies provided by the Act. Requiring automatic waiver of rights and remedies for such independent and distinct wrongs committed by the employer has no apparent relation to the Legislature's careful effort to limit the rights created by the Act.

Interpreting the Act in this way respects the Legislature's choice of language as well as its apparent policy choices. If the waiver provision is taken to apply more broadly than the right created by the Act, a court is confronted with questions about how broadly the waiver clause should be read that are, as the discussion in Parts IB and IC above demonstrates, both perplexing to the court and somewhat disrespectful of the Legislature. To interpret the provision broadly assumes that the Legislature wrote an unlimited, and therefore absurd, waiver provision, leaving it to the court to invent whatever limitation seems to make sense. *See, e.g., Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 125, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995) ("It would show little respect for the legislature were courts to suppose that the lawmakers meant to enact an irrational scheme") (internal citations omitted). In contrast, interpreting the waiver worked by Subsection 7 as symmetrical with the right created by the Act supplies a limitation that grows organically from the statute itself, rather than from the court's notion of good policy, and explains the absence of limiting language from the waiver clause. Moreover, if the Legislature was thinking of rights and remedies *similar* or *equivalent* to those created by the Act itself, then in the context of the Act as a whole, the Legislature's overall statement that the Act did not "diminish" rights or remedies provided by other sources makes perfect sense. The Act leaves unrelated rights and remedies of the employee untouched, and does not revoke or diminish remedies from other sources of law for the kind of whistleblowing it protects. It merely requires those who have been punished for such whistleblowing to elect either the Act's remedies or those from such another source, but not both.

This narrow understanding of both the Act and its waiver provision is consistent

Safety and Health Act); 33 U.S.C. § 1367 (Federal Water Pollution Control Act); 42 U.S.C. § 300j–9(i) (Safe Water Drinking Act); 42 U.S.C. § 5851(b)(2)(B) (Energy Reorganization Act); 42 U.S.C. § 6971 (Resource Conservation and Recovery Act); 42 U.S.C. § 7622 (Clean Air Act); 42 U.S.C. § 9610 (Comprehensive Environmental Response, Compensation, and Liability Act); 45 U.S.C. § 441(a) (Federal Railroad Safety Authorization Act). Whether election of New York's

Act could require waiver of any such federal whistleblower remedies is a question that is not implicated on the instant complaint since Collette's federal claims are unrelated to her allegations of whistleblower retaliation and thus do not overlap. *See supra* pp. 18–19 (discussing the Supremacy Clause implications of waiving federal rights and distinguishing *Leaman v. Ohio Dep't of Mental Retardation & Development Disabilities*, 825 F.2d 946 (6th Cir.1987) (*en banc* )).

with the strict construction of the Act's other provisions by the New York Court of Appeals. In *Remba v. Federation Emp. & Guidance Serv.*, 76 N.Y.2d 801, 559 N.Y.S.2d 961, 559 N.E.2d 655 (1990), the court narrowly construed Subsections 2(a) of the Act to preclude protection of an employee who reports an employer's fraudulent billing practices. In a brief *per curiam* opinion, the court stated that it "agreed with the Appellate Division" which had held that "[a]lthough the phrase 'substantial and specific danger to the public health or safety' is nowhere defined in Labor Law § 740 .... the Whistleblower law should be viewed as a narrow exception to the employment-at-will doctrine. Any effort to expand its protections is properly for the Legislature, not the courts." *Remba*, 149 A.D.2d 131, 545 N.Y.S.2d 140, 142 (1st Dep't 1989). In *Bordell v. General Elec. Co.*, 88 N.Y.2d 869, 644 N.Y.S.2d 912, 667 N.E.2d 922 (1996), the court again narrowly construed Subsection 2(a), this time to require as a precondition to protection under the Act, proof of an employer's "*actual* violation of law." *Id.* at 871, 644 N.Y.S.2d 912, 667 N.E.2d 922 (emphasis added). The court rejected the plaintiff's liberal construction which would have protected disclosures

based on an employee's "reasonable belief" of such violations—the controlling standard in most other states.[9] *Id.* at 870, 644 N.Y.S.2d 912, 667 N.E.2d 922.[10] Given such a strict construction of Subsection 2 of the Whistleblower Act by the New York Court of Appeals, this Court should not lightly adopt a broad construction of Subsection 7. *See, e.g., United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 24 (2d Cir.1989) ("In ascertaining the proper construction of a specific statutory provision [the court must] render it consistent with ... the statutory scheme of which it is a part") (citing 2A Sutherland Statutory Construction, § 46.05 (4th ed.1984)); *see also Pacheco*, 225 F.3d at 154 (same) (quoting *Bonanno* ). It would be anomalous indeed to construe the waiver provision more broadly than the affirmative protection that is the basic foundation of the statute.

### b. *Legislative History*

Second, a symmetrical interpretation of Subsection 7 is consistent with the purposes of the Whistleblower Act as revealed in its legislative history. *See, e.g., Ferres v. City of New Rochelle*, 68 N.Y.2d 446, 450, 510 N.Y.S.2d 57, 502 N.E.2d 972 (1986) ("in the interpretation of statutes,

**9.** At least ten states expressly provide protection for whistleblowers who reasonably believe or suspect that a violation has occurred. *See* Cal. Labor Code § 1102.5(a) (West 1989); Conn. Gen.Stat. Ann. §§ 31–51m(a) *et seq.* (West 1996 Supp.); Haw.Rev.Stat. §§ 378–61 *et seq.* (1994); Me.Rev.Stat. Ann., tit. 26, §§ 832 *et seq.* (West 1988); Mich. Comp. Laws Ann. §§ 15.361 *et seq.* (1994); Minn. Stat. Ann. §§ 181.931 *et seq.* (1993); N.H.Rev.Stat. Ann. §§ 275–E:1 *et seq.* (1995 Supp); N.J. Stat. Ann. §§ 34:19–1 *et seq.* (West 1988 and 1996 Supp.); N.C. Gen.Stat. §§ 95–240 *et seq.* (1985); N.D. Cent.Code § 34–01–20 (1995 Supp.); R.I. Gen. Laws §§ 28–50–1 *et seq.* (1995). Commentators note that New York's regime is of the most restrictive in any jurisdiction. *See generally* David C. Yamada, *Voices from the Cubicle: Protecting and Encouraging Private Employee Speech in the Post–Industrial Workplace*, 19 Berkley J. Emp. & Lab. L. 1, 40 (1998) ("The strict requirements of the New York statute mean that only the surest, or the dumbest, of

private-sector employees would be willing to report illegal activity under the assumption that they are covered by law"); Sandra J. Mullings, *Is There Whistleblower Protection of Private Employees In New York?*, 69 N.Y. Bar J. 36 (Feb.1997) (comparing the Act with legislation from other states).

**10.** Lower New York courts have similarly strictly construed this and other provisions of the Act. *See, e.g., Lamagna v. New York State Assoc. For the Help of Retarded Children, Inc.*, 158 A.D.2d 588, 551 N.Y.S.2d 556 (2d Dep't 1990) (termination on account of refusing to participate in fiscal improprieties does not state a claim) (construing N.Y. Labor Law § 740(2)(c)); *Kern v. DePaul Mental Health Services, Inc.*, 152 A.D.2d 957, 544 N.Y.S.2d 252 (4th Dep't 1989) (non-consensual sexual activity between mentally handicapped residents of hospital does not present a danger to "public health or safety") (construing New York Labor Law § 740(2)(a)).

the spirit and purpose of the act and the objects to be accomplished must be considered. *The legislative intent is the great and controlling principle"*) (internal quotation marks omitted) (emphasis in original). Although the Whistleblower Act has a limited scope—only protecting the disclosure of unlawful practices which present a substantial and specific danger to the public health or safety—it *does* protect, and intends to *encourage,* employee disclosures that fall within it. This public policy goal was set forth in Governor Mario Cuomo's Executive Approval Memorandum on signing the Act:

> Encouraging employees to bring violations to the attention of their employers and shielding them from employer retaliation if they disclose wrongful conduct to authorities, will protect the welfare of the people of this State, promote enforcement of the law, and give needed protection to employees who wish to act as law-abiding citizens without fear of losing their jobs.

Executive Memorandum, S. 10074 (N.Y. 1984). *See also* Attorney General's Memorandum, S. 10074 (N.Y.1984) ("By encouraging employees to bring violations to the attention of their employers and by shielding them from dismissal if they disclose wrongful conduct to authorities, this bill will protect the welfare of the people of this state [and] promote enforcement of the law").[11]

The Act encourages disclosures of this narrow category of unlawful behavior by assuring employees that they are protected from retaliation if they reveal such wrongdoing. The waiver provision is consistent with this purpose, if it is interpreted to require an election of remedies that protect the whistleblower; giving the employee the option of suing under a contractual or statutory whistleblower protection, but not both, allows the employee to select the remedy that is most advantageous, while guaranteeing that some remedy will be available, without imposing any additional cost on the employee. But requiring the employee, as the price of asserting whistleblower protection, to waive any rights he might have under independent causes of action (such as battery, or defamation, or sexual harassment, or employment discrimination) that may have arisen from the same course of employer conduct as the retaliatory firing, will create a disincentive to invoking the Act's protection, thus in turn deterring the very whistleblowing conduct that the Act intends to encourage.[12]

---

**11.** New York courts routinely rely on accompanying executive memoranda to interpret an ambiguous statutory provision. *See, e.g., Pirro v. Angiolillo,* 89 N.Y.2d 351, 358, 653 N.Y.S.2d 237, 675 N.E.2d 1189 (1996) (using executive memorandum to interpret provisions of New York Penal Law); *Chemical Specialties Manufacturers Association v. Jorling,* 85 N.Y.2d 382, 390, 626 N.Y.S.2d 1, 649 N.E.2d 1145 (1995) (using executive memorandum and Governor's Message of Approval to interpret New York environmental protection statutes); *see also* McKinney's Cons.Laws of N.Y., Book 1, Statutes § 14 ("The Governor's function in approving or disapproving bills submitted by the Legislature is legislative in nature").

**12.** In this case, it might be argued that the plaintiff's discrimination claims seek the same remedy—relief from a retaliatory discharge—that is offered to whistleblowers by the Act. But that would be a superficial view. According to the Complaint, Collette complained to her employer both about conduct (the receipt of donations from pharmaceutical companies) that may (or may not) have given rise to whistleblower protection under the Act, but did not implicate the protections of Title VII, and also about conduct (violations of equal employment regulations) that may (or may not) have given rise to protection against retaliation under Title VII, but certainly was not protected under the Act. (Compl. Ex. E & F.) She was then terminated. If, in order to challenge her termination under the Act, she would have to forego any protection under Title VII, plaintiff would be required to gamble on which legal claim might turn out to be stronger, and on what discovery might reveal about the true motives of her employer. Knowing this, an employee who already feared retaliation for complaints about equal opportunity violations might well be deterred from taking on additional risks by reporting conduct covered by the Whistleblower Act.

This is especially so in light of *Bordell,* 88 N.Y.2d at 871, 644 N.Y.S.2d 912, 667 N.E.2d

Thus, to incorporate a sweeping interpretation of the Whistleblower Act's waiver provision into what is in fact a narrowly conceived remedial statute would work against one of the Act's most fundamental public policies—encouraging disclosure of illegal activities which threaten public health and safety. There is no evident reason why the Legislature would want to attach such a price, and this Court is reluctant to adopt an interpretation of Subsection 7 which might chill the disclosure of even the narrow category of hazards which qualify for statutory whistleblower protection. *See, e.g., Coulthurst v. United States*, 214 F.3d 106, 110 (2d Cir.2000) (courts should avoid statutory construction which "undercut[s] legislative policy aims at the heart of the [statute]").

#### c. *Practice Commentary*

Third, the symmetrical interpretation of the waiver provision finds substantial support in the practice commentaries to the statute—an aid to interpretation that courts in New York may consider "authoritative" in the absence of precise textual guidance or binding authority (neither of which are present here). *See Clarke v. TRW, Inc.*, No. 93 Civ. 1524(FJS), 1994 WL 591677, at *3 (N.D.N.Y. October 26, 1994) (New York courts have found practice commentaries "authoritative") (internal citations omitted) (construing N.Y. Labor Law § 740); *see, e.g., Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000) (applying the interpretation of the practice commentaries to construe N.Y. Gen. Bus. Law §§ 349–350).

The practice commentary accompanying the Whistleblower Act explicitly counsels against the liberal "course of conduct" interpretation advanced by the defendant in this case. Instead, it urges courts to read Clause One (all rights retained) as controlling, and Clause Two (waiver of rights) as an exception, applicable in some instances, but not all, and requiring automatic waiver only of claims related to retaliation for whistleblowing—claims which might lead to duplicate or overlapping remedies:

> The compulsory waiver provision of § 740(7) Clause 2 is not a proviso which acts as a condition and takes precedence over the original rule of preservation of other rights in Clause 1, but is written as an exception, as such capable of narrow construction. *See Webster's Third International Dictionary* 1827 (1961) (a proviso expresses a 'condition, qualification or limitation'). *Clause 2 might appropriately be read to mean that the 'rights and remedies' which are 'deemed' waived are those for retaliation as such rather than all rights arising out of the incident involved.* On the other hand, duplicate or multiple recovery need not be permitted merely because multiple theories for seeking redress arising out of the same incident may be asserted, whether in a single or multiple forms. If losses of the type set forth in § 740 are awarded on another ground they obviously must be subtracted from any § 740 recovery and not granted twice . . . .

*Practice Commentaries* at 577–78 (emphasis added). Waiver of claims "for retaliation as such rather than all rights arising out of the incident involved" entails a narrow construction, requiring waiver of only

922, which restricts protection of the Act to disclosures of "actual violations" of a law, rule or regulation. If by the mere institution of a whistleblower claim based on a good faith, but erroneous, belief that an employer's hazardous activities were illegal, the complainant waived any and all other claims arising from his firing, no matter how meritorious, and regardless of their independence of the whistleblowing claim, the disparity between the limited protection of the Act and the high price for its invocation would surely discourage reporting of qualifying hazards.

Moreover, Collette also charges that her failure to be hired as Director resulted not only from retaliation of either kind but also from defendant's allegedly discriminatory hiring practices. The claims in Counts Four through Six therefore could not be considered as arising from "retaliation" in any sense.

those claims which arise from an employer's retaliation for whistleblowing activity *per se,* as opposed to claims arising from an entire course of conduct (incidents not related to whistleblowing), even though such claims might also have led to the alleged harm. *See, e.g., Kraus,* 586 N.Y.S.2d at 270 ("Although Labor Law § 740 provides that the institution of an action under the statute constitutes a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule, regulation, or remedy under the common law, the waiver only applies to those causes of action relating to retaliatory discharge").

The commentary goes on to note the constitutional questions that would be raised by a broad reading of the waiver provision to encompass federal rights, suggesting that because of these constitutional doubts, Subsection 7 should not be read to preclude federal claims even for whistleblower retaliation:

> Clause 2 of § 740(7) provides for automatic waiver of remedies under any collective bargaining agreement, law, rule or regulation—obviously including federal law—if a § 740(7) suit is instituted. This raises the federal question whether the Legislature can require waiver of federal rights against retaliation as a precondition for asserting otherwise available rights under state legislation. Such a requirement—as distinct from barring duplicative recovery—may violate the obligation of the states to enforce federal law, or stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.
>
> Thus, it is possible that federal laws which create claims for retaliation may apply notwithstanding suit being brought under § 740(7), provided there is no duplicate recovery. This would also make sense because the federal laws serve independent purposes apart from their protection against retaliation.

*Id.* (internal quotation marks and citations omitted). This argument applies even more strongly where the federal statute involved prohibits retaliation for reasons entirely unrelated to those prohibited by the New York Whistleblowers Act.

These commentary provisions strongly suggest that Subsection 7 is intended to avoid overlapping claims and duplicate recovery that might arise from an employer's retaliation for whistleblowing, rather than to require that a whistleblower plaintiff automatically waives rights to redress harms unrelated to whistleblowing. Thus, the practice commentary explicitly argues that while the waiver provision would require a whistleblowing employee to elect between an action under the Act and a grievance under a collective bargaining agreement that prohibited retaliation for whistleblowing, it would allow a fired employee to file suit under the Act without waiving a claim under an employment contract prohibiting dismissal without cause, or a suit for battery, even though the latter claims arose from the same course of conduct supporting the whistleblower claim:

> [I]f in retaliation for disclosing arguably unsafe as well as illegal crack sales by a welfare hotel management, an employee was shot, maimed and hence unable to work, and then denied health benefits, a § 740 claim for lost benefits should not operate to bar a suit for battery. The shooting would be independently illegal apart from its retaliatory character. The same reasoning can apply to less colorful situations where retaliation is not an element of the claim under a source of redress apart from § 740.

*Id.* at 577. Similarly, it would follow that an African–American employee who is fired after reporting that his employer illegally concealed a toxic waste dump (activity protected under the Act), would not, upon instituting a whistleblower complaint, waive the separate claim that the employer had also discriminated against him by taking his race into account in deciding to fire

him. While Collette's anti-discrimination claims include retaliation (Counts I—III) as well as discrimination as such (Counts IV—VI), the same logic applies to her situation.

### 4. *Conclusion*

Accordingly, after carefully considering the text of the Whistleblower Act as strictly construed by the New York Court of Appeals, its underlying purposes as described in its legislative history, and the important guidance provided by its practice commentaries, this Court rejects the defendant's "course of conduct" interpretation of Subsection 7, and concludes that its waiver provision applies only to rights and remedies concerning whistleblowing as defined in the Act. This standard effectuates the Act's remedial purpose by permitting employees to pursue legitimately independent claims, while prohibiting claims that duplicate or overlap the statutory remedies for retaliation on account of whistleblowing activity alone.

### C. *The Standard Applied*

█ Applying this standard, it is evident that Collette's claims are not waived. Counts I, II and III assert claims of retaliation under federal, state and local anti-discrimination laws alleging that she was denied a promotion, treated in a hostile manner, and discharged in retaliation for complaining about (a) the manner in which the CME directorial positions were filled, and (b) defendant's alleged violation of federal job posting regulations. Specifically, Collette alleges that she filed a Petition of Grievance with the defendant's Employee Resources Department alleging discriminatory hiring practices and non-compliance with EEO regulations, and that upon doing so.

> [she] began to be treated in an isolatory [sic] and hostile manner by her immediate supervisors, including her elimination from all CME planning meetings, and formal CME committee meetings, together with being unduly maligned respecting her work product, receiving

constant threats and innuendos of job termination, being subjected to false allegations of impropriety and other acts of intimidative, discriminatory and retaliatory actions by defendant's representatives.

(Compl. ¶ 31.) That is a different claim, based on separate facts, and seeking to protect a different legal interest, than the one asserted in Collette's whistleblower complaint. There, she alleged retaliation exclusively on account of her reporting unlawful financial contributions to the ACCME. (Marshall Aff. Ex. 2 ¶ 13–17.) Although that reporting is mentioned in plaintiff's instant complaint (Compl. ¶¶ 33–34), it is not the basis of her instant retaliation claim which is based solely on "plaintiff's opposition to defendant's unlawful employment practices" (*id.* ¶ 35), and her reporting of those practices to her immediate supervisors (*id.* ¶¶ 24–25), as well as to the defendant's Employee Resources Department (*id.* ¶ 29). On those differentiated facts, plaintiff's instant retaliation claims are not barred by Subsection 7.

Counts IV, V and VI allege that the manner in which St. Luke's filled the directorial positions "resulted in a disparate impact to individuals who are not Jewish," in violation of federal, state and local anti-discrimination laws. (*Id.* Ex. 1 ¶ 37, 44, 50.) The discrimination claims are clearly factually distinguishable from anything supporting plaintiff's whistleblower complaint, and might well survive even on a broader interpretation of Subsection 7. *See supra* n. 12; *see also, e.g., Betz v. Memorial Sloan–Kettering Cancer Center,* No. 95 CIV. 1156(RPP), 1996 WL 422242, at * 5–8 (S.D.N.Y.1996) (addressing the merits of both plaintiff's whistleblower retaliation claim and separate discrimination claim without addressing waiver). Accordingly, since plaintiff has adequately alleged claims of disparate impact discrimination that are distinguishable from the facts supporting her whistleblower complaint, these claims may not be dismissed as barred by Subsection 7.

## II. Failure to State a Claim

In addition to its argument that plaintiff waived her present claims when she brought her whistleblower action, defendant moves in the alternative to dismiss plaintiff's first six causes of action pursuant to Rule 12(b)(6) on grounds that plaintiff has not pled valid claims of retaliation and disparate impact under Title VII and the parallel state and city statutes. For the reasons that follow, defendant's motion is denied with respect to plaintiff's retaliation claims, and granted with respect to plaintiff's discrimination claims.

### A. Retaliation Claims

■ Claims I, II and III allege that St. Luke's discriminated against plaintiff because she complained that its employment practices violated equal opportunity laws. Section 704(a) of Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... or participated in any manner in an investigation ... under this subchapter." 42 U.S.C. § 2000e–3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Minott v. Port Authority of New York and New Jersey*, 116 F.Supp.2d 513, 520 (S.D.N.Y.2000) (quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)). To establish a claim for retaliation pursuant to Title VII, a plaintiff need not prove that her underlying discrimination claim was valid in the first instance. *See Sumner v. U.S. Postal Service*, 899 F.2d 203, 208–09 (2d Cir.1990). Because "the identical standards apply to employment discrimination claims brought under Title VII, ... Executive Law § 296 and the Administrative Code of the City of New York," *Keady v. Nike, Inc.*, 116 F.Supp.2d 428, 436 n. 8 (S.D.N.Y.2000) (internal citation omitted), plaintiff's state and city human rights law claims are analyzed in conjunction with her Title VII claims. *See, e.g., Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII") (internal citations omitted).

■ "In order to survive a motion to dismiss, a complaint asserting a civil rights violation must set forth specific factual allegations establishing a prima facie case." *Wilson v. Reuben H. Donnelley Corp.*, No. 98 Civ. 1750(AGS), 1998 WL 770555, at *3 (S.D.N.Y. November 2, 1998)(internal quotation marks omitted). A plaintiff makes out a prima facie case of Title VII retaliation if the pleadings show (1) that she was engaged in an activity protected by Title VII, (2) that her employer was aware of that activity, (3) that the employee suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse action. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 115 (2d Cir.2000); *see also Dean v. Westchester County District Atty's Office*, 119 F.Supp.2d 424, 432 (S.D.N.Y.2000) ("An employer violates Title VII as long as a retaliatory motive played some part in the adverse action; retaliatory motive does not have to be the sole cause of the adverse action") (citing *Sumner*, 899 F.2d at 209).

■ Collette's pleadings—alleging she was retaliated against for "opposition to defendant's unlawful employment practices" (Compl.¶ 35)—are sufficient to survive dismissal. The Complaint specifically alleges that upon learning that the defendant had not posted jobs in violation of federal regulations (as codified at 41 C.F.R. 61.1), Collette reported the violation to her immediate supervisors and then made a formal complaint to the defendant's Employee Relations Department. She further complained to the Employee Relations Department that the defendant's hiring policies resulted in a disparate impact on non-Jewish applicants. These re-

ports are protected activities under Title VII. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992) ("internal complaint to company management ... is protected activity within the policies of Title VII"). Since the complaints were made directly to the employer itself, there is no question, as there might be had the complaints been made to a governmental agency, that St. Luke's was aware of Collette's protests. Soon after making these formal complaints, plaintiff alleges, she was "treated in an isolatory and hostile manner by her immediate supervisors," refused the position of Associate Director of CME, and fired. (Compl.¶¶ 31, 32, 35.) Thus, plaintiff has alleged that she suffered adverse employment actions in the form of denial of promotion and termination of employment. Finally, plaintiff explicitly alleges that she was fired "[a]s a result of [her] opposition to defendant's unlawful employment practices," and that defendant "wrongfully retaliated against [her] by denying [her] promotion and by terminating her." (*Id.* ¶¶ 35, 37). Nothing about the facts pled in the Complaint renders this allegation of a causal connection between plaintiff's complaints and her termination implausible; on the contrary, the timing of the various actions raise at least a suspicion about whether plaintiff was subjected to unlawful retaliation in violation of Title VII. That is enough to survive the defendant's motion to dismiss. *See, e.g., Yaba v. Roosevelt,* 961 F.Supp. 611, 621 (S.D.N.Y.1997) (for complaints alleging Title VII retaliation "[t]he burden to survive a summary judgment motion is *de minimis,* and surely the burden to survive a motion to dismiss can be no greater") (internal citations omitted).

### B. *Discrimination Claims*

Claims IV, V, and VI allege that defendant's policies in filling the CME directorial positions, and its failure to post openings for those positions, had a disparate impact on non-Jewish candidates without adequate business justification in violation of Title VII and its state and city ana-

logues. As with Counts I, II, and III, the State and City laws parallel the requirements of Title VII, and the same standards apply in assessing the motion to dismiss.

"A plaintiff establishes a prima facie case of disparate impact by identifying a specific employment practice which, although facially neutral, has had an adverse impact on her as a member of a protected class." *Smith v. Xerox Corp.,* 196 F.3d 358, 364 (2d Cir.1999) (internal citations omitted). Thus, to prevail on this claim, Collette must establish at least the following three elements: First, she must "identify[ ] a specific employment practice" on the part of St. Luke's whose impact can be evaluated. *Id.* Second, she must demonstrate a significant adverse impact on some protected class: "To establish a prima facie case of disparate impact discrimination, a plaintiff must show that a facially neutral employment policy or practice has a *significant* disparate impact." *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 712 (2d Cir.1998) (emphasis added). Third, she must establish a causal connection between the employment practice and the adverse impact: Failure to allege a causal connection between a specific employment practice or policy and the alleged disparate impact is fatal to a plaintiff's disparate impact discrimination claim. *See id.* ("[plaintiff's] allegations of disparate impact fail because they do not adequately allege a causal connection between any facially neutral policy ... and the resultant proportion of minority employees"); *see, e.g., Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 159 (2d Cir.1991) ("[Title VII] places an initial burden on the plaintiff to show that the specific factor challenged under the disparate impact model *results* in the discriminatory impact") (emphasis added); *Trezza v. The Hartford, Inc.,* 98 Civ. 2205(MBM), 1998 WL 912101, at *7 (S.D.N.Y. December 30, 1998) ("a plaintiff must identify a specific employment practice and provide evidence sufficient to raise an inference that the

identified practice caused significant adverse affects on the protected group").

■ Collette's allegations of disparate impact fail on all three grounds. First, her Complaint does not allege any specific employment policy or practice which might be actionable under Title VII. (Compl.¶¶ 54–71.) Her opposition to the instant motion attempts to correct that defect by alleging that St. Luke's failure to post the availability of new directorial positions constitutes a "specific hiring practice" which "caused an imbalance in the hiring of Jewish individuals in management positions." (Pl.Mem.9.)[13] But defendant's failure to post two job openings on one specific occasion does not constitute an "employment practice" on the part of St. Luke's. It is undisputed that St. Luke's in fact has a general policy and practice of posting job openings, as required by federal regulations. Neither in the Complaint, nor in her motion papers, nor at oral argument, has Collette alleged that this policy is not generally complied with, or that the failure to post these particular openings was anything but an isolated lapse.

Unlike Title VII's prohibitions of intentional discrimination, the prohibition of disparate impact discrimination in certain circumstances is intended to redress procedures or policies that, without adequate justification, as a practical matter limit the job opportunities of historically-disfavored groups. *See Griggs v. Duke Power Co*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (establishing the basis for disparate impact claims by construing Title VII to proscribe "not only overt discrimination but also practices that are fair in form but discriminatory in practice"); *see also Wards Cove Packing Co. v. Atonio*, 490

U.S. 642, 656, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) ("Our disparate impact cases have always focused on the impact of *particular* hiring practices on employment opportunities for minorities") (emphasis in original).[14] It is difficult to see how one alleged instance of the defendant's failure to post a job—a job which the defendant was aware of, and interviewed for—is sufficient to plead an actionable employment practice or policy which limits the job opportunities of historically disfavored groups. *See, e.g., Feinson v. New School for Social Research*, 95 Civ. 7633(MBM), 1997 WL 742532, at *22 (S.D.N.Y. Dec. 1, 1997) ("plaintiff's claim that she was the victim of departures from policy and procedures is inherently inconsistent with a disparate impact claim, which is premised on a specific policy or practice that is applied equally to candidates but has a disproportionate impact on certain groups").

■ Second, for similar reasons, Collette's Complaint fails to allege any "significant" disparate impact, or indeed, any meaningful impact at all. While the Complaint appears to allege a disparate impact on non-Jewish applicants for "management positions" (Compl.¶¶ 23, 57), in response to defendant's motion, Collette makes clear that in fact she has a good faith basis for alleging no more than that in this particular instance, the candidates hired as Director and Associate Director of CME were both Jewish, while she, an unsuccessful candidate, is not. (Pl.Mem.9.) Collette does not allege that the employees at St. Luke's generally, or at any particular level of responsibility, or within any particular department, are disproportionately Jewish.

---

**13.** At oral argument, plaintiff's counsel could cite no other alleged practices or policies as contributing to disparate impact. (Tr. 31–34.)

**14.** Following *Wards Cove*, Congress enacted the Civil Rights Act of 1991, Pub.L. 102–166, § 105 (1991) (codified as amended at 42 U.S.C. § 2000e-2(k)(1)(A)(i)), which, *inter alia*, codified the plaintiff's prima facie burden of proof in disparate impact cases as

requiring a "demonstrat[ion] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." *See, e.g., Hack v. President and Fellows of Yale College*, 237 F.3d 81, 93–96 (2d Cir.2000) (discussing *Wards Cove* and amendments to the Civil Rights Act).

Nor does she provide any information about the religious or ethnic backgrounds of any of the applicants for the positions other than the two successful candidates and herself, let alone for the relevant pool of potential applicants. Even if such information were provided, the carefully-pared category of jobs on which Collette focuses is too small for the Court to engage in a meaningful inquiry into whether the hiring of Jewish candidates for these two specific positions constituted a "disparate impact" in any statistically-significant sense. As the Second Circuit has held, "[t]he smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it." *Pollis v. New School for Social Research,* 132 F.3d 115, 121 (2d Cir.1997). In *Pollis,* the court held that evidence based on a sample of only eight tenured male professors was insufficient to support a claim of disparate impact. Collette's sample of two Jewish managers is even smaller, and, therefore, even if the defendant's purported failure to post available job openings constitutes a cognizable employment practice, Collette has not alleged the corresponding requirement of significant disparate impact to non-Jewish applicants. *See also Wards Cove,* 490 U.S. at 652, 109 S.Ct. 2115 ("Racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact"). These are not mere evidentiary defects that could be resolved by discovery. The Complaint itself alleges disparate impact only with respect to this one job category, resulting from a single incident of non-posting, and plaintiff has not asserted a good faith belief in more general employment disparities at St. Luke's.

Third, although the Complaint alleges in conclusory terms that defendant's "hiring practices result in qualified non-Jewish individuals ... not being considered for defendant's management positions" (Compl.¶ 57), neither in the Complaint nor in any other place has plaintiff stated any specific facts, or even advanced a theory, as to how the alleged practice of failing to post vacancies (assuming *arguendo* that there even was such a policy) *caused* any disparate impact on non-Jewish applicants (assuming *arguendo* that such applicants were underrepresented in any cognizable employment category). Nothing about the facts alleged suggests that the failure to post the availability of the Director and Associate Director jobs would permit Jewish applicants to be aware of openings while non-Jewish applicants remain uninformed. *See e.g., Lopez,* 930 F.2d at 159–60 ("The causal requirement of Title VII recognizes that underrepresentation [of a protected class] might result from any number of factors, and it places an initial burden on the plaintiff to show that the specific factor challenged under the disparate impact model results in the discriminatory impact"). Failure to post a job would seem to make all applicants, regardless of race or religion, unaware of the specific opening. Plaintiff does not allege that any population of "insiders" who might have become aware of the CME positions in the absence of posting was disproportionately Jewish. Indeed, Collette herself was an "insider" in the sense that she was aware of the position, sought it, and was evidently considered for it, without the need for posting. Plaintiff has thus failed to present any rational connection between the failure to post the vacancy and the religious beliefs or ethnicity of those selected.

In short, the Complaint alleges no facts that would permit a rational juror to find disparate impact discrimination. Accordingly, Counts IV, V and VI of the Complaint are dismissed with prejudice. Plaintiff's request (Pl.Mem.9) for leave to amend is denied, since nothing in the record gives any indication of what additional facts plaintiff would allege if permitted to amend. *See Marchi v. Bd. of Cooperative Educ. Services of Albany,* 173 F.3d 469, 477–78 (2d Cir.1999) ("leave to amend ... may be denied within the trial court's dis-

cretion where the proposed amendment would be futile"). If any such additional facts exist, plaintiff may seek leave to amend by a properly-supported motion pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

### CONCLUSION

Defendant's motion to dismiss the Complaint is granted as to the fourth, fifth and sixth causes of action, and denied in all other respects.

SO ORDERED.